1  **NORMA A. AGUILAR**
   California State Bar No. 211088
2  **Federal Defenders of San Diego, Inc.**
   225 Broadway, Suite 900
3  San Diego, CA 92101-5030
   (619) 234-8467/Fax: (619) 687-2666
4  E-Mail: norma_aguilar@fd.org

5  Attorneys for Mr. Perez-Lemos,

6

7

8                  UNITED STATES DISTRICT COURT

9               SOUTHERN DISTRICT OF CALIFORNIA

10                **(HONORABLE DANA M. SABRAW)**

11  UNITED STATES OF AMERICA,      )    CASE NO. 08CR1191-DMS
                                   )
12                     Plaintiff,  )    DATE:  MAY 12, 2008
                                   )    TIME:  11:00 A.M.
13  v.                             )
                                   )    STATEMENT OF FACTS AND
14  DAVID PEREZ-LEMOS,             )    MEMORANDUM OF POINTS AND
                                   )    AUTHORITIES IN SUPPORT OF
15                     Defendant.  )    DEFENDANT'S MOTIONS
                                   )
16  _____ )    _____
                                   )

17              **STATEMENT OF FACTS**[1]

18       On March 31, 2008, at 6:25 p.m., Border Patrol Agent Jason Alba was stationed at the El Cajon,

19  California, Border Patrol Station when he received a phone call from a citizen caller.  The caller

20  indicated that she observed a tan Yukon and a white sedan pulled over on the side of the road.[2]  She

21  stated that they were pulled over together and that suspected illegal aliens were jumping into the back of

22  the Yukon while the white sedan was waiting by the vehicle.  She mentioned that the vehicles were on

23

24  _____

25       [1]       Unless otherwise stated, the "facts" referenced in these papers come from government-
    produced discovery that the defense continues to investigate.  Mr. Perez does not admit the accuracy of this
26  information and reserves the right to challenge it at any time.

27       [2]       These statements are taken directly from Government-produced discovery.  Mr. Perez does
    not know whether they are a summary of the caller's statements, the agent's characterizations, or a verbatim
28  statement.  Thus, he contests the accuracy of them.

the side of State Route 94, just east of the Mountain Empire campground.  According to her statement, after the people got in the vehicle, the vehicles went eastbound on Route 94.  Other than the fact that the Government's report refer to the caller as female, there is no other identifying information in the Government's discovery.

Agent Jorge Zuniga observed two vehicles at 6:30 which he believed matched the description conveyed to him by Agent Alba.[3]  Based on the fact that the vehicles matched the description, Agent Zuniga called for assistance to stop and question the subjects of both vehicles.  Agent Zuniga pulled behind the white sedan while another agent, Agent Sweet, followed the Yukon.  While Agent Sweet observed the Yukon's driver appear nervous and have trouble navigating the Yukon, Agent Zuniga continued to follow the white sedan.  Agent Zuniga pulled over the white sedan, which Mr. Perez was driving.  Agent Zuniga began questioning Mr. Perez about his activities in the area.  Although Agent Zuniga did not observe anything illegal in the vehicle, he nonetheless placed Mr. Perez under arrest.

Later, after being advised of his right to remain silent, Mr. Perez invoked his <u>Miranda</u> rights.

The January 2007 Grand Jury returned an indictment against Mr. Perez, charging him with Transportation of Illegal Aliens and Aiding and Abetting, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (v)(II).

---

[3]     It is unclear the precise information conveyed to Agent Zuniga by Agent Alba.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE
INSTRUCTIONS PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL
OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS*.**

**A.    Introduction**

The indictment in the instant case was returned by the January 2007 grand jury. That grand jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007. See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A. Judge Burns' instructions deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in several ways.[4]

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, see Ex. A at 3, 3-4, 5,[5] Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." See id. at 8. The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient.'" *See id.* at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred to an instance in the grand juror selection process in which he excused three potential jurors. See id. at 8.

---

[4]    See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam). Mr. Perez acknowledges that the rulings in these cases did not directly support his position. Mr. Perez, however, believes that those cases do not permit the excesses here.

[5]    See also id. at 20 ("You're all about probable cause.").

08CR1191-DMS

1  I've gone over this with a couple of people. You understood from the questions and answers
2  that a couple of people were excused, I think three in this case, because they could not adhere
   to the principle that I'm about to tell you.

3  Id. That "principle" was Judge Burns' discussion of the grand jurors' inability to give effect to their

4  disagreement with Congress. See id. at 8-9.[6] Thus, Judge Burns not only instructed the grand jurors on his

5  view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

6     In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the

7  grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. See

8  id. at 20.[7]

9  Now, again, this emphasizes the difference between the function of the grand jury and the
10 trial jury. You're all about probable cause. If you think that there's evidence out there that
   might cause you to say "well, I don't think probable cause exists," then it's incumbent upon
11 you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are
   duty-bound to present evidence that cuts against what they may be asking you to do if they're*
12 *aware of that evidence.*

13 Id. (emphasis added).[8] The district court later returned to the notion of the prosecutors and their duties,

14 advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will

15 be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you." See id. at 27.

16    This motion follows.

17

18

19

20

21

22  ───────────────

23    [6]   Counsel has ordered the grand jury selection transcript. Counsel understands that the court
24 reporter has refused the prepare the transcript. This Court should order that the transcript be prepared.
   Because Fed.R.Crim.P. 6 permits challenges to grand jurors by the parties, the selection process cannot be
25 secret. At any rate, this Court should also order disclosure under rule 6(e).

26    [7]   These instructions were provided in the midst of several comments that praised the United States
   attorney's office and prosecutors in general.

27
   [8]   The "in most instances" language suggests that there may be some limit on this principle. Again,
28 counsel has ordered the full transcript, and it will likely resolve the question posed in the instant footnote.

1    **B.**    ***Navarro-Vargas* Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury.**

2

3         The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to

4    grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth

5    Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic

6    approach[9] to the problems posed by the instructions, endorsed many of the substantive arguments raised by

7    the defendants in those cases. The district court's instructions cannot be reconciled with the role of the grand

8    jury as set forth in Navarro-Vargas II.

9         For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas

10   II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

11   deciding whether a particular prosecution shall be instituted or followed up, performs much the same

12   function as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478,

13   510 (1978)). Accord Navarro-Vargas I, 367 F.3d at 900 (Kozinski, J., dissenting) (The grand jury's

14   discretion in this regard "is most accurately described as prosecutorial."). See also Navarro-Vargas II, 408

15   F.3d at 1213 (Hawkins, J., dissenting). It recognizes that the prosecutor is not obligated to proceed on any

16   indictment or presentment returned by a grand jury, id., but also that "the grand jury has no obligation to

17   prepare a presentment or to return an indictment drafted by the prosecutor." Id. See Niki Kuckes, The

18   Democratic Prosecutor: Explaining the Constitutional Function of the Federal Grand Jury, 94 Geo. L.J.

19   1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute

20   of grand jury review from the perspective of those who insisted that a grand jury clause be included in the

21   Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure § 15.2(g) (2d ed. 1999)).

22        Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth

23   in Vasquez v. Hillery, 474 U.S. 254 (1986). See id.

24        The grand jury thus determines not only whether probable cause exists, but also whether to
         "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps

25

26        9    See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority

27   because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible
     'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

28

1  most significant of all, a capital offense or a non-capital offense -- all on the basis of the
2  same facts.  And, significantly, the grand jury may refuse to return an indictment even
   "'where a conviction can be obtained.'"

3  Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's description of

4  the grand jury's attributes in  Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury

5  "controls not only the initial decision to indict, but also significant questions such as how many counts to

6  charge and whether to charge a greater or lesser offense, including the important decision whether to charge

7  a capital crime."  Id. at 399 (citing Vasquez, 474 U.S. at 263).

8      Judge Hawkins notes that the Navarro-Vargas II majority accepts the major premise of Vasquez: "the

9  majority agrees that a grand jury has the power to refuse to indict someone even when the prosecutor has

10 established probable cause that this individual has committed a crime."  See id. at 1214 (Hawkins, J.

11 dissenting).  Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J., dissenting); Marcucci, 299 F.3d at

12 1166-73 (Hawkins, J., dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support

13 in the Ninth Circuit.  But not in Judge Burns' instructions.

14 **C.   The Instructions Forbid the Exercise of Grand Jury Discretion Established in Both *Vasquez***
15 **and *Navarro-Vargas II*.**

16      The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand

17 jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous

18 decision in Marcucci.  Marcucci reasoned that the instructions do not mandate that grand jurors indict upon

19 every finding of probable cause because the term "should" may mean "what is probable or expected."  299

20 F.3d at 1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge

21 Hawkins ably pointed out.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The

22 instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or

23 obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").  See

24 also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting *The Oxford American

25 Diction and Language Guide* 1579 (1999) (brackets in original)).

26      The debate about what the word "should" means is irrelevant here; the instructions here make no

27 such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not

28 choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

1   disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against

2   indicting even though I think that the evidence is sufficient'...." See Ex. A at 8-9. Thus, the instruction

3   flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution. No

4   grand juror would read this language as instructing, or even allowing, him or her to assess "the need to

5   indict." Vasquez, 474 U.S. at 264.

6        Nor does the Navarro-Vargas II majority's faith in the structure of the grand jury a cure for the

7   instructions excesses.   The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its

8   independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its

9   decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may

10  have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it

11  independent." Id. at 1202 (emphases in the original).

12       Judge Hawkins sharply criticized this approach.   The majority, he explains, "believes that the

13  'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

14  of many of its decisions -- sufficiently protects that power." See id. at 1214 (Hawkins, J., dissenting).  The

15  flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

16  making a probable cause determination ... unconstitutionally undermines the very structural protections that

17  the majority believes save[] the instruction." Id. After all, it is an "'almost invariable assumption of the law

18  that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)).  If that

19  "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

20  in Vasquez.   Indeed, "there is something supremely cynical about saying that it is fine to give jurors

21  erroneous instructions because nothing will happen if they disobey them." Id.

22       In setting forth Judge Hawkins' views, Mr. Perez understands that this Court may not adopt them

23  solely because the reasoning that supports them is so much more persuasive than the majority's sophistry.

24  Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

25       Here, again, the question is not an obscure interpretation of the word "should", but an absolute ban

26  on the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell,

27  and both Navarro-Vargas II opinions.  Navarro-Vargas II is distinguishable on that basis, but not only that.

28  //

1    Judge Burns did not limit himself to denying the grand jurors the power that <u>Vasquez</u> plainly states

2    they enjoy.  He also apparently excused prospective grand jurors who might have exercised that Fifth

3    Amendment prerogative, excusing "three [jurors] in this case, because they could not adhere to [that]

4    principle...."  <u>See</u> Ex. A at 8.  The structure of the grand jury and the secrecy of its deliberations cannot

5    embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the

6    conscience of the community.  <u>See</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a

7    grand jury exercising its powers under <u>Vasquez</u> "serves ... to protect the accused from the other branches

8    of government by acting as the 'conscience of the community.'") (quoting <u>Gaither v. United States</u>, 413 F.2d

9    1061, 1066 &  n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on

10   their own initiative, rules of grand jury procedure," <u>United States v. Williams</u>, 504 U.S. 36, 50 (1992), and,

11   here, Judge Burns has both fashioned his own rules and enforced them. The instructions here are therefore

12   structural error.  <u>See</u> <u>Navarro-Vargas II</u>, 408 at 1216-17 (Hawkins, J., dissenting).  The indictment must be

13   dismissed.

14   **D.    <u>The Instructions Conflict With <i>Williams</i>' Holding that there Is No Duty to Present Exculpatory</u>**
     **<u>Evidence to the Grand Jury.</u>**

15

16   In <u>Williams</u>, the defendant, although conceding that it was not required by the Fifth Amendment,

17   argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

18   exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

19   common law. <u>See</u> 504 U.S. at 45, 51. <u>Williams</u> held that "as a general matter at least, no such 'supervisory'

20   judicial authority exists." <u>See</u> <u>id.</u> at 47. Indeed, although the supervisory power may provide the authority

21   "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

22   amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

23   Court and by Congress to ensure the integrity of the grand jury's functions,'" <u>id.</u> at 46 (citation omitted), it

24   does not serve as "a means of <i>prescribing</i> such standards of prosecutorial conduct in the first instance." <u>Id.</u>

25   at 47 (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own

26   initiative, rules of grand jury procedure." <u>Id.</u> at 50.  As a consequence, <u>Williams</u> rejected the defendant's

27   claim, both as an exercise of supervisory power and as Fifth Amendment common law. <u>See</u> <u>id.</u> at 51-55.

28   //

Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. <u>See</u> Ex. A at 20.

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that ev[idence]*

<u>Id.</u> (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." <u>See</u> <u>id.</u> at 27.

This particular instruction has a devastating effect on the grand jury's protective powers, particularly if it is not true. It begins by emphasizing the message that <u>Navarro-Vargas II</u> somehow concluded was not conveyed by the previous instruction: "You're all about probable cause." <u>See</u> Ex. A at 20. Thus, once again, the grand jury is reminded that they are limited to probable cause determinations (a reminder that was probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely would be excused if they rejected this limitation). The instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor will present it. The end result, then, is that grand jurors should consider evidence that goes against probable cause, but, if none is presented by the government, they can presume that there is none. After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence." <u>See</u> <u>id.</u> Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." <u>See</u> <u>id.</u> at 27.

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

//

1
(1)  I have to consider evidence that undercuts probable cause.

2
(2)  The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.

3
(3)  Because no such evidence was presented to me, I may conclude that there is none.

4
Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the

5
evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-

6
bound prosecutor would have presented it.

7
The instructions therefore discourage investigation -- if exculpatory evidence were out there, the

8
prosecutor would present it, so investigation is a waste of time -- and provide additional support to every

9
probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

10
of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under

11
the Fifth Amendment**.**

12
**II.**

13
**THIS COURT MUST SUPPRESS ALL FRUITS OF THE ILLEGAL STOP OF THE VEHICLE BECAUSE IT WAS NOT SUPPORTED BY REASONABLE SUSPICION.**

14

15
The Fourth Amendment's prohibition against unreasonable searches and seizures extends to the

16
investigatory **stop** of a vehicle. See United States v. Brignoni-Ponce, 422 U.S. 873, 878, 95 S.Ct. 2574,

17
45 L.Ed.2d 607 (1975).  In determining whether there was **reasonable suspicion** to justify the stop, a

18
Court "must look at the 'totality of the circumstances' of [the] case to see whether the detaining officer

19
has a 'particularized and objective basis' for suspecting legal wrongdoing."  United States v. Arvizu, 534

20
U.S. 266, 750 ( 2002) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981));  see also United

21
States v. Rodriguez, 976 F.2d 592, 594 (9th Cir.1992), amended by 997 F.2d 1306 (9th Cir.1993)

22
(holding that an officer may not detain a motorist without a showing of a "particularized and objective

23
basis for suspecting the particular person stopped of criminal activity") (quoting Cortez, 449 U.S. at

24
417-18).  Thus, while some factors may be "susceptible to innocent explanation, and some factors are

25
more probative than others," the inquiry is whether, taken together, "they sufficed to form a

26
particularized and objective basis" for making  the stop. Arvizu, 122 S.Ct. at 753.

27
//

28
//

In <u>United States v. Sigmond-Ballesteros</u>, 285 F.3d 1117, 1120 (9th Cir. 2001), the trial court found sufficient reasonable suspicion to justify a traffic stop. Basing its findings on a totality of the circumstances, the trial court noted the following: that the defendant had been driving at about 4:20 a.m. on a road known for alien smuggling; that the defendant repeatedly covered his face; that he suddenly changed lanes and then suddenly pulled off the road; and that the truck lacked a rear seat in the cab of the truck. <u>Id.</u> at 1120. In reversing the trial court, the Ninth Circuit did not accept what appeared to be a "prefabricated or recycled profile of suspicious behavior very likely to sweep many ordinary citizens into a generality of suspicious appearance merely on hunch." <u>Rodriguez</u>, 976 F.2d at 595-96 (emphasis omitted). Thus, the Court focused on the real danger of permitting law enforcement to justify stops based on factors that would sweep up too many innocent people.

In Mr. Perez' case, law enforcement relied on a tip to justify its search. While reasonable suspicion can, in certain circumstances, be based on a tip, that is true only if it has sufficient indicia of reliability. <u>Florida v. J.L.</u>, 529 U.S. 266, 270 (2000). With respect to anonymous tips, Courts have been wary of their inherent unreliability. The Supreme Court expressed it thus:

> Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.'

<u>Id.</u> (internal citations omitted). <u>J.L.</u>, involved an anonymous phone call, during which the caller advised the Miami-Dade Police that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." <u>Id.</u> at 268. Six minutes after the call, police searched J.L., a young black male wearing a plaid shirt who was standing at a bus stop. The Court focused on the information available to them and the fact that it arose from an unknown source. <u>Id.</u> at 270. Thus, even the fact that J.L fit the general description given was insufficient to justify his stop. <u>See also United States v. Sandoval</u>, 390 F.3d 1077 (9th Cir. 2004) (anonymous tip indicating specific location where 24-year old defendant knows as 'Budda" was pointing a gun at a woman was reliable because it was corroborated by officer's observations of what looked like a gun in defendant's lap and his otherwise suspicious behavior).[10]

---

[10]    The Ninth Circuit explicitly gives less weight to tips regarding general criminal activity rather than a 911-phone call that might indicate exigent circumstances. <u>See United States v. Terry-Crespo</u>, 356 F.3d 1170, 1176 (giving greater weight to non-anonymous tipster because, "911 call prior to the <u>Terry</u>

1     Even where the tip comes from a known source, it can fail to have an adequate level of reliability

2  to justify a stop. For example, in <u>United States v. Fernandez-Castillo</u>, 324 F.3d 1114 (9th Cir. 2003), the

3  Ninth Circuit examined which factors can lend reliability to a known source's tip.  In that case, law

4  enforcement was tipped off by a Montana Department of Transportation employee that a vehicle was

5  driving erratically, straddling the oncoming traffic lanes.  <u>Id.</u> at 1115-1116.  The tip also included a

6  description of the car and its license plates.  Once law enforcement located the vehicle, they

7  independently saw it make "'one large movement towards the center line then back again.'"  <u>Id.</u> at 1116.

8  Significantly, the officer who stopped the vehicle was aware that tip had come from an employee of the

9  Montana Department of Transportation, personnel with whom he had previously worked and who had a

10  proven track record of reliability.  <u>Id.</u> at 1118-1119.  The Court made it clear that "[it did] not hold that

11  the [Montana Department of Transportation] report, **standing alone**, provided Officer Schock with

12  **reasonable suspicion** to **stop** the car absent Officer Schock's own corroborating observations."  <u>Id.</u> at

13  1119-1120.  The Court explicitly did not reach that question.

14     The Government has not identified the source of tip and thus there is no evidence before this

15  Court as to his or her reliability.  Moreover, the agents' observations did not corroborate its reliability.

16  The Government's reports indicate that Agent Sweet, the agent following the Yukon, observed the

17  driver's behavior which he found suspicious.  Agent Sweet, however, did not pull over Mr. Perez.

18  Indeed, Agent Zuniga did not make the same observations with respect to the white sedan, the car driven

19  by Mr. Perez.

20     This stop is particularly troubling because of the contents of the tip.  In <u>Fernandez-Castillo</u>, the

21  tipster--an employee of the Montana Department of Transportation--observed the defendant cross over

22  the center divider, a clear violation of the law.  The tipster in the instant case indicated that she saw

23  people who she believed were "illegal aliens" enter a vehicle.  Obviously, unlike the clear law violation

24  from <u>Fernandez-Castillo</u>, a person's illegal status cannot be determined merely by merely looking at

25  them.

26

27  _____

28  stop was entitled to greater reliability than a tip concerning general criminality because the police must take
   911 emergency calls seriously and respond with dispatch.")

Mr. Perez' stop was not justified by reasonable suspicion.  Thus, all fruits of the stop must be suppressed.

### III.

### MOTION TO COMPEL DISCOVERY AND PRESERVE EVIDENCE

Mr. Perez-Lemos moves for the production by the government of the following discovery and for the preservation of evidence.  This request is not limited to those items that the prosecutor knows of, but rather includes all discovery listed below that is in the custody, control, care, or knowledge of any government agency.  See generally Kyles v. Whitley, 514 U.S. 419 (1995); United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989).  By this requests, he intends to invoke all his discovery rights under both statutory and Constitutional authority.  This his request includes but is not limited to:

(1)  The Defendant's Statements.  The Government must disclose to the defendant all copies of any written or recorded statements made by the defendant; the substance of any statements made by the defendant which the Government intends to offer in evidence at trial; any response by the defendant to interrogation; the substance of any oral statements which the Government intends to introduce at trial and any written summaries of the defendant's oral statements contained in the handwritten notes of the Government agent; any response to any Miranda warnings which may have been given to the defendant; as well as any other statements by the defendant.  Fed. R. Crim. P. 16(a)(1)(A).  The Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that the Government must reveal all the defendant's statements, whetheroral or written, regardless of whether the government intends to make any use of those statements.

(2)  Arrest Reports, Notes and Dispatch Tapes.  The defense also specifically requests that all arrest reports, notes and dispatch or any other tapes that relate to the circumstances surrounding his arrest or any questioning, if such reports have not already been produced in their entirety, be turned over to him. This request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in which statements of the defendant or any other discoverable material is contained.  This is all discoverable under Fed. R. Crim. P. 16(a)(1)(A) and Brady v. Maryland, 373 U.S. 83 (1963).  See also Loux v. United States, 389 F.2d 911 (9th Cir. 1968).  Arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to the

1    defendant are available under Fed. R. Crim. P. 16(a)(1)(B) and (C), Fed. R. Crim. P. 26.2 and 12(i).

2    Preservation of rough notes is requested, whether or not the government deems them discoverable.

3        (3) <u>Brady Material</u>.  Mr. Perez-Lemos requests all documents, statements, agents' reports, and

4    tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of

5    the government's case.  Impeachment as well as exculpatory evidence falls within <u>Brady's</u> definition of

6    evidence favorable to the accused. <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>,

7    427 U.S. 97 (1976).

8        (4)  <u>Any Information That May result in a Lower Sentence Under The Guidelines</u>.  As discussed

9    above, this information is discoverable under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  This request

10    includes any cooperation or attempted cooperation by the defendant, as well as any information that

11    could affect any base offense level or specific offense characteristic under Chapter Two of the

12    Guidelines.  Also included in this request is any information relevant to a Chapter Three adjustment, a

13    determination of the defendant's criminal history, or any other application of the Guidelines.

14        (5) <u>The Defendant's Prior Record</u>.  Evidence of prior record is available under Fed. R. Crim. P.

15    16(a)(1)(B).  Counsel specifically requests a complete copy of any criminal record.

16        (6) <u>Any Proposed 404(b) Evidence</u>.  Evidence of prior similar acts is discoverable under Fed. R.

17    Crim. P. 16(a)(1)(C) and Fed. R. Evid. 404(b) and 609.  In addition, under Fed. R. Evid. 404(b), "upon

18    request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the

19    general nature . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at

20    trial.  The defendant requests that such notice be given three weeks before trial in order to give the

21    defense time to adequately investigate and prepare for trial.

22        (7) <u>Evidence Seized</u>. Evidence seized as a result of any search, either warrantless or with a

23    warrant, is discoverable under Fed. R. Crim. P. 16(a)(1)(C).

24        (8) <u>Request for Preservation of Evidence</u>.  The defense specifically requests that all dispatch

25    tapes or any other physical evidence that may be destroyed, lost, or otherwise put out of the possession,

26    custody, or care of the government and which relate to the arrest or the events leading to the arrest in this

27    case be preserved.  This request includes, but is not limited to, <u>all persons who were apprehended as</u>

28    <u>passengers in the van at issue in the instant case</u>, the results of any fingerprint analysis, the defendant's

personal effects, the vehicle, and any other evidence seized from the defendant or any third party.  It is requested that the government be ordered to question all the agencies and individuals involved in the prosecution and investigation of this case to determine if such evidence exists, and if it does exist to inform those parties to preserve any such evidence.

(9) Tangible Objects.  The defense requests, under Fed. R. Crim. P. 16(a)(1)(C) the opportunity to inspect and copy as well as test, if necessary, all other documents and tangible objects, including photographs, books, papers, documents, photographs of buildings or places or copies of portions thereof which are material to the defense or intended for use in the government's case-in-chief or were obtained from or belong to the defendant.  Specifically, Mr. Perez-Lemos requests a copy of the videotape interview of the material witness, if one exists.

(10) Evidence of Bias or Motive to Lie.  The defense requests any evidence that any prospective government witness is biased or prejudiced against the defendant, or has a motive to falsify or distort his or her testimony.  Pennsylvania v. Ritchie, 480 U.S. 39 (1987); United States v. Strifler, 851 F.2d 1197 (9th Cir. 1988).

(11) Impeachment evidence.  Mr. Perez-Lemos requests any evidence that any prospective government witness has engaged in any criminal act whether or not resulting in a conviction and whether any witness has made a statement favorable to the defendant.  See Fed. R. Evid. 608, 609 and 613.  Such evidence is discoverable under Brady v. Maryland, supra.  See United States v. Strifler, 851 F.2d 1197 (9th Cir. 1988) (witness' prior record); Thomas v. United States, 343 F.2d 49 (9th Cir. 1965) (evidence that detracts from a witness' credibility).

(12) Evidence of Criminal Investigation of Any Government Witness. The defense requests any evidence that any prospective witness is under investigation by federal, state or local authorities for any criminal conduct.  United States v. Chitty, 760 F.2d 425 (2d Cir. 1985).

(13) Evidence Affecting Perception, Recollection, Ability to Communicate.  Mr. Perez-Lemos requests any evidence, including any medical or psychiatric report or evaluation, tending to show that any prospective witness's ability to perceive, remember, communicate, or tell the truth is impaired; and

//

//

any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an alcoholic.  United States v. Strifler, 851 F.2d 1197 (9th Cir. 1988); Chavis v. North Carolina, 637 F.2d 213, 224 (4th Cir. 1980).

(14) Witness Addresses.  The defense requests the name and last known address of each prospective government witness.  See United States v. Napue, 834 F.2d 1311 (7th Cir. 1987); United States v. Tucker, 716 F.2d 576 (9th Cir. 1983) (failure to interview government witnesses by counsel is ineffective); United States v. Cook, 608 F.2d 1175, 1181 (9th Cir. 1979)) (defense has equal right to talk to witnesses).  The defendant also requests the name and last known address of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will not be called as a government witness.  United States v. Cadet, 727 F.2d 1453 (9th Cir. 1984).

(15) Name of Witnesses Favorable to the Defendant.  Mr. Perez-Lemos requests the name of any witness who made any arguably favorable statement concerning the defendant or who could not identify him or who was unsure of his identity, or participation in the crime charged.  Jackson v. Wainwright, 390 F.2d 288 (5th Cir. 1968); Chavis v. North Carolina, 637 F.2d 213, 223 (4th Cir. 1980); Jones v. Jago, 575 F.2d 1164, 1168 (6th Cir.), cert. denied, 439 U.S. 883 (1978); Hudson v. Blackburn, 601 F.2d 785 (5th Cir. 1979), cert. denied, 444 U.S. 1086 (1980).

(16) Statements Relevant to the Defense.  Mr. Perez-Lemos requests disclosure of any statement that may be "relevant to any possible defense or contention" that he might assert.  United States v. Bailleaux, 685 F.2d 1105 (9th Cir. 1982).  This would include Grand Jury transcripts which are relevant to the defense motion to dismiss the indictment.

(17) Jencks Act Material.  The defense requests all material to which Mr. Perez-Lemos is entitled pursuant to the Jencks Act, 18 U.S.C. § 3500, reasonably in advance of trial, including dispatch tapes.  A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under § 3500(e)(1).  Campbell v. United States, 373 U.S. 487, 490-92 (1963).

(18) Giglio Information.  Pursuant to Giglio v. United States, 405 U.S. 150 (1972), the defendant requests all statements and/or promises, expressed or implied, made to any government witnesses, in

//

1  exchange for their testimony in this case, and all other information which could arguably be used for the

2  impeachment of any government witnesses.

3       (19) <u>Reports of Scientific Tests or Examinations</u>.  Pursuant to Fed. R. Crim. P. 16(a)(1)(D), the

4  defendant requests the reports of all tests and examinations conducted upon the evidence in this case.

5  Including, but not limited to, any fingerprint testing done upon any evidence seized in this case, that is

6  within the possession, custody, or control of the government, the existence of which is known, or by the

7  exercise of due diligence may become known, to the attorney for the government, and which are material

8  to the preparation of the defense or are intended for use by the government as evidence in chief at the

9  trial.

10       (20) <u>Henthorn Material</u>.  The defense requests that the prosecutor review the personnel files of

11  the officers involved in his arrests, and those who will testify, and produce to him any exculpatory

12  information at least two weeks prior to trial and one week prior to the motion hearing.  <u>See</u> <u>United States</u>

13  <u>v. Henthorn</u>, 931 F.2d 29 (9th Cir. 1991).  In addition, he requests that if the government is uncertain

14  whether certain information is to be turned over pursuant to this request, that it produce such information

15  to the Court in advance of the trial and the motion hearing for an <u>in</u> <u>camera</u> inspection.

16       (21) <u>Informants and Cooperating Witnesses</u>.  Mr. Perez-Lemos requests disclosure of the names

17  and addresses of all informants or cooperating witnesses used or to be used in this case.  The government

18  must disclose the informant's identity and location, as well as disclose the existence of any other

19  percipient witness unknown or unknowable to the defense.  <u>Roviaro v. United States</u>, 353 U.S. 53, 61-62

20  (1957).  Mr. Perez-Lemos also requests disclosure of any information indicating bias on the part of any

21  informant or cooperating witness.  <u>Giglio v. United States</u>, 405 U.S. 150 (1972).  Such information

22  would include inducements, favors, payments, or threats made to the witness to secure cooperation with

23  the authorities.

24       (22) <u>Expert Witnesses</u>.  The defendant requests disclosure of any expert witnesses the

25  government intends to call at trial and "a written summary of testimony that the government intends to

26  use," including the "witnesses' opinions, the bases and the reasons for those opinions" and his or her

27  qualifications.  Fed. R. Crim. P. 16(a)(1)(E).

28  //

(23) <u>Residual Request</u>.  The defense intends by this discovery motion to invoke his rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States.  This request specifically includes all subsections of Rule 16. Mr. Perez-Lemos requests that the government provide him and his attorney with the above requested material sufficiently in advance of trial.

## IV.

## <u>REQUEST FOR LEAVE TO FILE FURTHER MOTIONS</u>

To date, Mr. Perez-Lemos and defense counsel have received limited discovery from the government. It is anticipated that as new information comes to light, the defense will likely find it necessary to file further motions.  For example, Mr. Perez-Lemos only has two reports generated by agents, even though a number of agents were involved in the surveillance.  Significantly, the government has not provided the "line-sheets" of the surveillance that were referenced by the discovery.  Therefore, Mr. Perez-Lemos requested that defense counsel be allowed the opportunity to file further motions based upon information gained through the discovery process.

## V.

## <u>CONCLUSION</u>

For the reasons stated above, Mr. Perez-Lemos moves this Court to grant his motions.

Respectfully submitted,

Dated: April 28, 2008

_____/s/ Norma A. Aguilar_____
**NORMA A. AGUILAR**
Attorney for Mr. Perez-Lemos
norma_aguilar@fd.org