KAREN P. HEWITT
United States Attorney
PETER J. MAZZA
Assistant U.S. Attorney
California State Bar No. 239918
JOSEPH S. GREEN
California State Bar No. 251169
Federal Office Building
880 Front Street, Room 6293
San Diego, CA 92101-8893
Telephone: (619) 557-5528/(619) 235-2757 (Fax)
peter.mazza@usdoj.gov

Attorneys for Plaintiff
United States of America

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>DAVID PEREZ-LEMOS (2),<br>Defendant. | Case No. 08CR1191-DMS<br>**GOVERNMENT'S TRIAL MEMORANDUM**<br>Date: July 21, 2008<br>Time: 9:00 a.m.<br>Hon.: Dana M. Sabraw |

COMES NOW Plaintiff, UNITED STATES OF AMERICA, by and through its counsel, KAREN P. HEWITT, United States Attorney, and PETER J. MAZZA and JOSEPH S. GREEN, Assistant United States Attorneys, and hereby files its Trial Memorandum.

//

//

//

//

//

//

//

//

//

# I.

## STATEMENT OF THE CASE

### A. CHARGES & INDICTMENT

On April 15, 2008, a grand jury sitting in the Southern District of California returned a three-count indictment charging Defendant David Perez-Lemos ("Defendant") with transportation of illegal aliens and aiding and abetting. On April 17, 2008, Defendant was arraigned on the Indictment.

### B. TRIAL STATUS

Trial is scheduled for July 21, 2008 at 9:00 a.m., before the Honorable Dana M. Sabraw. The Government anticipates that its case-in-chief will take two days.

### C. STATUS OF DEFENDANT

Defendant has been in custody since his arrest.

### D. STATUS OF COUNSEL

Defendant is represented by Norma Aguilar, Esq., Federal Defenders of San Diego, Inc. (appointed counsel).

### E. INTERPRETER

The Government does not anticipate an interpreter will be needed.

### F. JURY WAIVER

Defendant has not waived trial by jury.

### G. PRETRIAL MOTIONS

On April 28, 2008, Defendant filed motions to: (1) dismiss the indictment for grand jury violation; (2) suppress evidence that was fruit of illegal stop; (3) compel discovery/preserve evidence; and (4) grant leave to file additional motions. On May 16, 2008, the Government filed a response in opposition. On June 5, 2008, the Court denied Defendant's motion to suppress evidence based on an illegal stop after holding an evidentiary hearing.

### H. STIPULATIONS

The parties have not agreed to any stipulations.

//

//

## I. DISCOVERY

To date, the United States has produced 175 pages of discovery, six dvds, and four compact discs to Defendant. The Government has complied, and will continue to comply, with its discovery obligations. Defendant has not provided any reciprocal discovery.

## II

## STATEMENT OF FACTS

On March 31, 2008, at approximately 6:25 p.m., a motorist traveling eastbound on California State Route-94 ("SR-94") observed a tan Chevrolet Yukon sports utility vehicle ("SUV") and a white sedan traveling together just west of the Mountain Empire Campground. The SUV illegally passed the motorist, which then pulled over to allow the white sedan to pass as well. Shortly thereafter, the motorist saw the Yukon stopped in the middle of SR-94 while several individuals jumped into the Yukon's rear cargo area. The motorist notified the United States Border Patrol ("USBP") El Cajon, California Station regarding the suspected alien smuggling activity. USBP Agent Jason Alba informed agents in the field of the motorist's report. The motorist waited for the Yukon, before proceeding eastbound on SR-94. Moments later, the motorist again saw the two vehicles traveling together northbound on Buckman Springs Road.

Approximately five minutes after the motorist called the station, USBP Agent Jorge Zuniga observed two vehicles that matched the description given by Agent Alba pass him in a northbound direction as he drove south on Buckman Springs Road. He saw the two vehicles approximately 100 yards north of the Buckman Springs Road/SR-94 intersection. Agent Zuniga noticed several individuals crouching down in the Yukon. Agent Zuniga also noticed that the white sedan followed closely behind. This area is approximately three miles east of the campground and approximately one mile north of the United States-Mexico border. Agent Zuniga believed these two vehicles to be the same vehicles identified by the motorist based on his distance from the Mountain Empire campground and the amount of time that had passed since he received the dispatch from Agent Alba. Agent Zuniga stopped for a brief moment before making a U-turn in order to get behind the white sedan. Moments later, USBP Agent Canyon Sweet observed the two vehicles approach his stationary position on Buckman Springs Road north of where Agent Zuniga had seen them. He observed only one visible occupant in the Yukon,

the driver. Agent Sweet noted that the driver exhibited nervous behavior, such as gripping the steering wheel tightly and staring straight ahead as he passed. Agent Zuniga, once again behind the white sedan, observed the white sedan slow down considerably as the Yukon approached the Agent Sweet's location, which allowed Agent Sweet to get in between the Yukon and the white sedan. However, once Agent Zuniga caught up to the white sedan, it then accelerated at a rapid speed and separated from Agent Zuniga. Agent Sweet estimated that the white sedan had opened up a one-quarter mile opening between itself and the Yukon as the Yukon approached Agent Sweet's position.

Agent Sweet noticed the Yukon had trouble navigating the curves of SR-94 and that it swayed considerably, despite that it traveled within a safe range of speed for the road. Agent Sweet also observed that the Yukon appeared to be heavily laden in its rear cargo area. Based on his training and experience, Agent Sweet believed the driver was having difficulty navigating the road because of excess weight and because the driver was frequently checking his rear view mirror as Agent Sweet followed the vehicle.

Agent Sweet attempted to conduct a vehicle stop of the Yukon by activating his emergency lights and sirens after following it for a few miles. The Yukon, however, did not yield. Another USBP agent who was positioned ahead of Agent Canyon deployed a controlled tire deflation device (CTDD) on the Yukon as it approached. The CTDD was successful, despite efforts by the Yukon's driver to avoid the CTDD. The Yukon continued for approximately one mile before finally coming to a stop. At that point, the driver and several of the passengers attempted to flee on foot. Agent Sweet, however, apprehended the driver after a brief chase who was later identified as Defendant Angel Bermudez. The other individuals were also quickly apprehended. In total, agents apprehended 11 individuals from the Yukon. Each of the ten passengers admitted they were citizens and natives of Mexico without legal entitlement to enter or remain in the United States. Defendant Bermudez stated he was a United States citizen.

After the Yukon failed to yield to Agent Sweet, Agent Zuniga performed a vehicle stop of the white sedan. The white sedan stopped approximately 200 yards from the Yukon's final location. Agent Zuniga approached the vehicle, and the driver, later identified as Defendant Perez-Lemos, stated that he was a United States citizen. Agent Zuniga observed that the vehicle's key was unaccompanied by

any other keys or a key ring. Agent Zuniga also noticed two cell phones in the center console area of the white sedan. One of the cell phones was broken in half.

Defendant Perez-Lemos stated that he received the phone in that condition. When asked where he was coming from and where he was going, Defendant Perez-Lemos stated that he was coming from Tijuana, Baja California, Mexico and was on his way to Compton, California. When asked for identification, Defendant Perez-Lemos stated that he had had his wallet and personal belongings stolen in Tijuana. Defendant Perez-Lemos further stated that a friend had loaned him the vehicle and that he was not the owner. When asked, Defendant Perez-Lemos avoided providing Agent Zuniga the name of his friend. Finally, when asked about any possible connection regarding Defendant Bermudez, Defendant Perez-Lemos stated that he did not know Defendant Bermudez, nor was he aware of Defendant Bermudez's involvement in alien smuggling. Agent Zuniga took custody of Defendant Perez-Lemos and the evidence seized from his vehicle.

A subsequent search of the white sedan also revealed a piece of paper regarding a court date for Defendant Bermudez, the driver of the Yukon.

Following the incident, agents interviewed passengers of the Yukon. Material Witness Rodrigo Angulo-Arzate stated that he had made arrangements with an unknown smuggler to be smuggled into the United States for $2,000. Angulo stated that he crossed the border earlier in the day with a foot guide. Angulo stated that he feared for his life when the Yukon driver swerved from side to side as he attempted to flee from the Border Patrol. Angulo could not identify the driver of the vehicle.

Agents also interviewed Material Witness Carlos Del Monte-Palacios. Del Monte-Palacios stated that his aunt made arrangements to have him smuggled into the United States. He stated that he crossed the border with a large group, which was led by a guide. At the pick up location, the guide informed the aliens to enter the Yukon. Del Monte-Palacios could not identify the driver.

Finally, Material Witness Olegario Noriega-Gonzalez also interviewed with agents. Noriega-Gonzalez stated that he had made arrangements with an unknown smuggler to be smuggled into the United States for $2,000. Noriega stated that he crossed as part of a large group of illegal aliens who were led by a foot guide. Noriega could not identify the driver of the load vehicle.

//

**E. Defendant's Criminal Record**

Defendant has several misdemeanor convictions: (1) 2002 for infliction of corporal injury on a spouse/cohabitant (30 days jail, three years probation); (2) 2002 possession of a controlled substance (102 days jail, three years probation); (3) 2007 driving on a suspended license/reckless driving (40 days jail, three years probation); (4) 2007 driving on a suspended license (15 days jail); (5) 2008 driving on a suspended license (45 days jail), three years probation); and (6) 2008 driving on a suspended license (30 days jail), three years probation).

**III**

**LEGAL ISSUES**

**A. Elements of the Charged Offenses**

1. Elements of Title 8, United States Code, Section 1324(a)(1)(A)(ii) and (v)(II), Aiding and Abetting in the Transportation of Illegal Aliens

Defendant is charged in counts one, two, and three with aiding and abetting the transportation of illegal aliens. The essential elements of a violation of 8 U.S.C. Section 1324(a)(1)(A)(ii) and (v)(II), Aiding and Abetting the Transportation of Illegal Aliens are:

a. The person named in the count was an alien;

b. The person was not lawfully in the United States;

c. The defendant knew, or was in reckless disregard of the fact that the person was not lawfully in the United States;

d. The defendant knowingly transported or moved, or attempted to transport or move the person in order to help the person remain in the United States illegally; and

e. The defendant aided or abetted in the commission of the preceding acts.

The Ninth Circuit has stated that "an aider and abetter is a person who knowingly and intentionally helps another to commit a crime." United States v. Cruz-Ventura, 979 F.2d 146, 149 (9th Cir. 1992) (citing Manual of Model Criminal Jury Instructions for the Ninth Circuit, § 5.01 (1992)). In order to prove that Defendant aided and abetted in the transportation of illegal aliens, the Government must prove beyond a reasonable doubt that: (1) the crime of transportation of illegal aliens was committed by someone; (2) the defendant knowingly and intentionally aided, counseled, commanded, induced or procured that person to commit each element of transportation of illegal aliens; and (3) the

defendant acted before the crime was completed. Ninth Circuit Model Jury Instructions, 5.1 Aiding and Abetting; see also United States v. Garcia, 400 F.3d 816, 819 n.2 (9th Cir. 2005) (stating the Government must prove four elements for aiding and abetting liability: (1) that the accused had the specific intent to facilitate the commission of a crime by another; (2) that the accused had the requisite intent of the underlying substantive offense; (3) that the accused assisted or participated in the commission of the underlying substantive offense; and (4) that someone committed the underlying substantive offense). It is insufficient that the Government prove that the defendant merely associated with the individual committing the crime, that the defendant unknowingly or unintentionally helped, or that the person was merely present at the time the crime was committed. See United States v. Burgess, 791 F.2d 676, 680 (9th Cir. 1986). The evidence must show beyond a reasonable doubt that the defendant acted with the knowledge and intention of helping that person transport illegal aliens. See id. at 679.

The Ninth Circuit has repeatedly stated that "[a]iding and abetting is not a separate and distinct offense from the underlying substantive crime, but is a different theory of liability for the same offense." Garcia, 400 F.3d at 820 (rejecting the defendant's claim that aiding and abetting is a separate offense from the substantive crime); see also, United States v. Gaskins, 849 F.2d 454, 459 (9th Cir. 1988). Therefore, regardless of whether a defendant is charged and convicted as a principal or as one who aided and abetted the underlying crime, the defendant will be liable as a principal. See, e.g., 18 U.S.C. § 2.

**B. Expert Testimony**

"If specialized knowledge will assist the trier of fact in understanding the evidence or determining an issue, a qualified expert witness may provide opinion testimony on the issue in question." United States v. Cordoba, 104 F.3d 225, 229 (9th Cir. 1997) (citing F.R.E. 702). The trial judge is the gatekeeper regarding the type and scope of expert testimony that should be admitted in any particular trial and has "broad latitude" in determining the relevance and reliability of such testimony. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 142 (1999).

**1. United States Border Patrol Agent Andrew Kahl**

The United States has given notice that USBP Andrew Kahl may testify regarding the transportation of illegal aliens. Specifically, Agent Kahl may testify regarding the transportation of

illegal aliens in San Diego County, as well as the use of scout vehicles and communication devices to facilitate the transportation of illegal aliens. The basis for Agent Kahl's testimony lies in his 11 years of experience as a USBP agent, including his personal investigation of hundreds of alien smuggling cases, communications and interactions with other law enforcement personnel, cooperating defendants and confidential informants, and formal training from the federal law enforcement academy.

On July 1, 2008, the United States provided defense counsel with written notice regarding expert testimony regarding the transportation of illegal aliens. On July 8, 2008, the United States sent defense counsel a follow-up letter to clarify the identity of the Government's anticipated expert witness. At this time, the United States provided a copy of Agent Kahl's qualifications.

**a. Modus Operandi of Alien Smugglers Is A Proper Subject of Expert Testimony**

The Ninth Circuit repeatedly has upheld the use of expert testimony to explain criminal modus operandi. "Government experts may testify as to the general practices of criminals to establish the defendants' modus operandi which helps the jury to understand complex criminal activities, and alerts it to the possibility that combinations of seemingly innocuous events may indicate criminal behavior." United States v. Freeman, 498 F.3d 893, 906 (9th Cir. 2007) (citation omitted) (upholding admission of expert testimony that defendant's words and actions were "consistent with the common practices of drug traffickers"); United States v. Patterson, 819 F.2d 1495, 1507 (9th Cir. 1987) (allowing expert testimony on how criminal narcotics conspiracies operate). Although often utilized in complex cases, modus operandi testimony is permitted in non-complex cases as well. See United States v. Figueroa-Lopez, 125 F.3d 1241, 1244 (9th Cir. 1997) ("[W]e even allow modus operandi expert testimony in cases that are not complex.") (citation omitted).

The methods and tactics of alien smugglers in San Diego County are not matters within the common knowledge of an average juror. Testimony concerning such methods and tactics would assist the trier of fact in understanding the significance of the facts of this case and Defendants' role in the alien smuggling operation at issue in this case.

The Ninth Circuit has relied on expert testimony in alien smuggling cases to uphold § 1324 convictions. See, e.g., United States v. Tsai, 282 F.3d 690, 697 (9th Cir. 2002) (affirming alien smuggling conviction based, in part, on government expert testimony "regarding the usual fees paid to

escorts and the usual price paid by a smuggled alien"). District courts in this circuit similarly have allowed expert testimony on modus operandi in alien smuggling prosecutions. See, e.g., United States v. Flores-Perez, 2007 WL 4259167 (S.D. Cal. Dec. 4, 2007) (Lorenz, J.) (Border Patrol Agent testified as expert witness "regarding the alien smuggling techniques used in Imperial Valley," that agent "had never encountered a case where someone playing a role in an alien smuggling organization had participated without expecting some sort of financial gain" and explained "the structure of small-scale smuggling organizations"); United States v. Malboa-Pena, 2007 WL 2903013 (D. Ariz. Oct. 3, 2007) (allowing expert testimony on alien smuggling modus operandi to explain "how aliens are staged in hotels, how aliens are guided by foot guides across the border, how relatives are to make payment to other persons, how aliens are picked up in a van . . .").[1]

Here, the expert testimony offered by Agent Kahl will explain the methods and tactics of alien smugglers in the San Diego area, including the use of "scout" vehicles and the use of communication facilities to further the transportation of aliens within the United States. The testimony will assist the jury to understand in what ways a non-"load" vehicle can assist in the transportation of illegal aliens. Such testimony is relevant in the context of this alien smuggling prosecution and falls well within the broad scope of permissible expert testimony under Federal Rule of Evidence 702.

**b. The Expert Testimony Will Not Violate F.R.E. 704(b)**

It is undisputed that an expert witness may not opine "as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto." F.R.E. 704(b). "A prohibited 'opinion or inference' under Rule 704(b) is testimony from which it necessarily follows, if the testimony is credited, that the defendant did or did not possess the requisite mens rea." United States v. Morales, 108 F.3d 1031, 1037 (9th Cir. 1997) (in prosecution for false

---

[1] The Government is unaware of any published Ninth Circuit opinion addressing expert testimony on the modus operandi of alien smugglers. However, the Ninth Circuit has upheld such testimony on multiple occasions in unpublished opinions. See, e.g., United States v. Vaca-Hernandez, 1999 WL 451214 (9th Cir. May 5, 1999); United States v. Salazar-Munoz, 2000 WL 1529233 (9th Cir. Oct., 3, 2000); United States v. Inda-Mendoza, 2000 WL 425018 (9th Cir. 2000); United States v. Arnold, 2001 WL 111488 (9th Cir. Feb. 7, 2001).

bookkeeping entries, expert could properly testify that defendant had weak grasp of bookkeeping because such testimony did not state opinion or draw necessary inference that defendant intended to make false entries). Stated otherwise, an expert witness violates Rule 704(b) where he or she offers an "explicit opinion" on the defendant's state of mind. United States v. Murillo, 255 F.3d 1169, 1178 (9th Cir. 2001) (finding no violation of Rule 704(b) where expert testified as to his "experience with drug traffickers" generally and did not offer an "explicit opinion" as to the defendant's knowledge or intent); see also United States v. Freeman, 498 F.3d 893, 906-07 (9th Cir. 2007) (upholding admission of expert testimony that defendant's "words and actions were consistent with the common practices of drug traffickers" because expert "offered no opinion as to whether Freeman possessed the requisite criminal intent to possess and distribute cocaine, but instead described a common practice of those who do have such intent").

Here, as in Morales, Murillo and Freeman, Agent Kahl will not offer any opinion as to whether Defendant possessed the requisite criminal intent to smuggle aliens. There is no basis to exclude his testimony concerning the modus operandi of alien smugglers under Rule 704(b).

**c. The Government Will Not Offer "Alien Smuggler Profile" or Structure Testimony**

The Ninth Circuit has explained, in the context of narcotics cases, that "[a] drug courier profile is a somewhat informal compilation of characteristics believed to be typical of persons unlawfully carrying narcotics, commonly used by agents as a basis for reasonable suspicion to stop and question a subject." United States v. Cordoba, 104 F.3d 225, 229 (9th Cir. 1997).

Agent Kahl will not testify that Defendant fits any sort of "alien smuggler profile." The Ninth Circuit's opinion in Cordoba, is instructive. There, the defendant challenged the admission of expert testimony concerning the modus operandi of drug traffickers. Specifically, the defendant asserted that testimony to the effect that drug traffickers do not use unknowing couriers constituted impermissible profile evidence. Id. The Ninth Circuit rejected this argument:

> [T]estimony that drug traffickers do not entrust large quantities of drugs to unknowing transporters is not drug courier profile testimony. None of the expert testimony in this case was admitted to demonstrate that Cordoba was guilty because he fit the characteristics of a certain drug courier profile.

Id. at 230.

The reasoning of Cordoba holds true here. Agent Kahl will testify about the methods and tactics of alien smugglers. He will not testify that Defendant is guilty "because he fit the characteristics of a certain [alien smuggler] profile." Id.

Nor will Agent Kahl's testimony constitute impermissible structure testimony. In a line of cases beginning with United States v. Vallejo, 237 F.3d 1008 (9th Cir. 2001), the Ninth Circuit has recognized that "the admission of expert testimony about the structure of drug trafficking organizations violates Federal Rules of Evidence 401 and 403 when the defendant is not charged with a conspiracy to import drugs or when the evidence is not otherwise probative of a matter properly before the court." United States v. Pineda-Torres, 287 F.3d 860, 863 (9th Cir. 2002) (citing Vallejo, 237 F.3d at 1012). Each of these cases was a"simple border bust case," Pineda-Torres, 287 F.3d at 864, where the defendant was not charged with conspiracy and there was no evidence "establishing a connection between the defendant and a drug trafficking organization." Id. Indeed, the "only issue" in both Pineda-Torres and Vallejo "was whether the defendant knew that there were drugs in the car." Id. Given these particular facts, the Ninth Circuit found "[t]he implication of the expert testimony and the government's argument to the jury in both cases [Pineda-Torres and Vallejo] was plainly that the defendant was a member of an international drug organization and had knowledge that drugs were in the car." Id.

The rule of Pineda-Torres and Vallejo has no application here for several reasons. First, and most important, Defendant is charged with aiding and abetting the transportation of illegal aliens. This is not a "simple border bust case," and, ample evidence exists in this case linking Defendant to his co-conspirator Defendant Bermudez. Second, expert testimony concerning alien smuggling modus operandi will not be offered to show that Defendant had knowledge of the aliens in Defendant Bermudez's vehicle. Finally, Agent Kahl will not "extrapolate about the various roles individuals might play in hypothetical drug trafficking organizations" or "imply that [defendants] participated in a large-scale operation," the primary reasons why structure testimony was held inadmissible in Pineda-Torres and Vallejo. Id. at 865. He will only be called upon to provide testimony about how multiple individuals may aid and assist the illegal transportation of aliens within in the United States. Unlike the Vallejo-line of cases, there is no risk of impermissible testimony regarding "hypothetical" criminal

organizations. Accordingly, the Court should exercise its wide discretion to permit the expert testimony of Agent Kahl.

**2. Immigration and Customs Enforcement Special Agent Jerry Conrad**

The United States has also given notice that Immigration and Customs Enforcement ("ICE") Special Agent Jerry Conrad may testify regarding the Treasury Enforcement Communications Systems ("TECS") and the border crossing history of Defendant Perez-Lemos and the white sedan. Accordingly, the Government has produced all TECS records that the Government may introduce at the time of trial.

United States v. Sanchez-Robles, 927 F.2d 1070 (9th Cir. 1991) is instructive, despite that it involved the illegal importation of narcotics. In Sanchez-Robles, the defendant was convicted of importation of marijuana and cocaine, as well as possession of those drugs with intent to distribute, stemming from her arrest at the Calexico Port of Entry. See id. at 1070. During its rebuttal case, the Government offered TECS evidence to show border crossings of both the defendant's vehicle, and the vehicle she drove on the night of her arrest. See id. at 1078. This evidence was offered for two purposes. First, to contradict the story given by the defendant to customs officials upon her arrest, when she explained that she borrowed the vehicle from a friend she had known for just one month. The TECS evidence showed that the van she borrowed and her own vehicle made several crossings close in time to one another before the defendant claimed to have known the owner of the van. See id. Second, the defendant's daughter testified at trial that she was on a date in the family vehicle on the evening of the defendant's arrest. The TECS evidence offered by the Government showed no crossing that evening. See id. The Ninth Circuit upheld the use of the TECS evidence as relevant, not in violation of rule 608(b), which prohibits extrinsic evidence solely for impeachment, and not in violation of rule 404(b). As to the latter point, the Court held that the evidence was inextricably intertwined to the offense conduct charged and, accordingly, held that the TECS evidence was properly admitted. See id. Accordingly, the TECS records related to Defendant's personal crossing history as well as the crossing of his vehicle are admissible.

**C. Percipient Witness Information**

The Government anticipates that the motorist who observed the two vehicles involved in possible alien smuggling may be called to testify. If so, the Government objects to any inquiry by

Defendant regarding the motorist's residence, or the motorist's purpose for traveling on SR-94 and Buckman Springs Road. Not only are such questions wholly irrelevant to the motorist's observations, but they would unnecessarily reveal highly personal information that could potentially place the motorist in danger, and at the very least, cause the motorist great apprehension.

In Alford v. United States, 282 U.S. 687 (1931) and Smith v. Illinois, 390 U.S. 129 (1968), the Supreme Court held, that as a general matter, inquiry into a witness's identity and residence is a proper avenue of cross-examination. However, the Supreme Court has since made clear that exceptions to this general rule exist and trial courts maintain wide discretion to limit the scope of cross-examination. See, e.g., Delaware v. Van Arsdall, 475 U.S. 673 (1986). In Van Arsdall, the Supreme Court recognized that such limits may be placed on defense counsel's ability to inquire into the potential bias against a witness based on concerns about the witness's safety, harassment, prejudice, confusion of issues, or interrogation that is only "marginally relevant" to the matter at issue. Id. at 679. "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam) (emphasis in original). Thus, appellate courts have since interpreted the Alford/Smith doctrine of law to stand for the proposition that limitation on inquiry into the personal life of a Government witness is permitted so long as such limitation does not deny the defendant effective cross-examination. See, e.g., Clark v. Ricketts, 958 F.2d 851, 854-55 (9th Cir. 1992) (as amended).

First, the Government does not intend to call any witness in its case-in-chief whose identity has not already been disclosed to Defendant prior to trial. Second, the Government expects the motorist's testimony, if called, would be limited to percipient observations made while driving on SR-94 and Buckman Springs Road. Counsel for Defendant should be afforded every opportunity to impeach the witness on the accuracy of the witness's observations, thereby providing Defendant with effective cross-examination. However, the motorist's residence and purpose for traveling on those roads is not even "marginally relevant" to the expected testimony. See Van Arsdall, 475 U.S. at 679.

Additionally, revealing the motorist's residence and/or allowing other questions that could lead to the revelation of similar information would unnecessarily expose the motorist to potential danger or harassment. As distinguishable from virtually every other case that involves a similar question, this case

involves the personal information of a *private* citizen, not a Government informant. The motorist lives in the Southern District of California, and specifically in an area that is heavily trafficked by illegal aliens attempting to further their illegal entry into the United States. The motorist is aware of the operation of specific alien smuggling organizations in the area. To force the motorist to reveal such personal information would be to effectively punish the motorist for reporting the suspected activity to the Border Patrol, and may possibly have a chilling effect on others who contemplate reporting similar activity to Border Patrol.

While certainly relevant to demonstrating that Defendant aided an abetted the transportation of illegal aliens, the motorist's testimony, if given, will not amount to the cornerstone of the Government's case**.** The Smith Court highlighted the relative importance of a Government witness as a factor in determining whether the witness's name and residence should be revealed. The Smith Court based its decision on the fact that the prohibited cross-examination was of the Government's chief witness whose testimony differed in important respects to that of the defendant. In light of the importance of the credibility resolution, the Court held that the defendant had a right to inquire about the chief witness's true name and address after it had been established that the witness gave a false name on direct examination. Smith, 390 U.S. 129 at 131.

The motorist's situation in this case is different than that of the witnesses' in Smith and Alford in another important respect. The protection of the motorist's personal information presents a different situation than the one typically confronted by courts with Government informants. For instance, in holding that the defendant was entitled to elicit from a Government informant that he was in federal custody, the Alford Court reasoned that this information was critical because a jury might infer the cooperator's testimony was biased because of an expectation that the testimony might be given under a promise or expectation of immunity, or under the coercive effect of the United States. Alford, 282 U.S. at 693. No such bias issue is present with the motorist. The motorist obviously is not a Government informant, and therefore does not present the same possibility for natural biases.

If the Court, however, believes that the motorist's residence and purpose for traveling on these roads may be proper grounds for cross-examination, the Government requests that in camera hearings be held for the Government to provide more specific information and for Defendant to provide what

"particularized need" exists to question the motorist about this information. See, e.g., United States v. Cavallaro, 553 F.2d 300, 305 (2nd Cir. 1977).

**D. Statements Made By Defendant Perez-Lemos**

Following Agent Zuniga stopping his vehicle, Defendant Perez-Lemos made several statements to Agent Zuniga prior to being taken into custody. Defendant stated that: (1) he was a United States citizen; (2) he was on his way from Tijuana to Compton, California; (3) he received a broken cell phone in that condition and did not know how it was broken; (4) his wallet and all other personal belongings, including identification, had been stolen in Tijuana; (5) he was not the owner of the vehicle, but had borrowed it from a friend whose name he refused to give; and (6) he did not know Defendant Bermudez, nor was he aware of the fact that Defendant Bermudez had been involved in alien smuggling.

In Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court reaffirmed the Government's right to investigate suspicious activity. As Terry noted, it would be both impractical and unwise for the law to require that police wait until probable cause exists to investigate suspicious behavior. Terry, 391 U.S. at 25. In the context of police stops along roadways, this means that the principles of Miranda are inapplicable. See, e.g., United States v. Hickman, 523 F.2d 323 (9th Cir. 1975) (holding that officer's questions regarding suspect's identity, ownership of boat, and destination of the boat were permissible with Miranda warnings to investigate the stop even where the police blocked the suspect's path of egress). In Hickman, the Ninth Circuit held that where a routine traffic stop is made, and subsequent questions are asked of a suspect absent a "police dominated" atmosphere, Miranda warnings are not required. Hickman, 523 F.2d at 327; see also Lowe v. United States, 407 F.2d 1391, 1394 (9th Cir. 1969) (holding that where an officer stops a vehicle and the driver provides unsatisfactory answers, further questions about the driver's destination and business do not constitute "in custody" interrogation that require Miranda protections). The Hickman court reasoned that where an officer makes an investigatory stop, "it is the very purpose of the investigatory stop to allow the officer to confirm or deny these suspicions by reasonable questioning, rather than forcing in each instance the 'all or nothing' choice between arrest and inaction." Id. The Supreme Court further held shortly after Miranda that whether police have probable cause at a given point has no relevance as to when the person's right to receive Miranda warnings attaches. Hoffa v. United States, 385 U.S. 293 (1966).

Statements made by Defendant Perez-Lemos are admissible as admissions by a party-opponent, Fed. R. Evid. 801(d)(2), and did not violate his Miranda rights. The questions asked by Agent Zuniga were "directly related" to Agent Zuniga's reasonable suspicion that the vehicle may have been involved in alien smuggling activity. See Hickman, 523 F.2d at 327. Nor did the questions asked by Agent Zuniga exceed the scope of the stop of his vehicle. United States v. Torres-Sanchez, 83 F.3d 1123, 1128 (9th Cir. 1996) (holding officers permitted to continue to question suspect even after being placed in patrol car as the questions related to the purpose of the original stop). The questions posed to Defendant were directly related to the purpose of the original stop – to investigate further Agent Zuniga's reasonable suspicion that Defendant was involved in alien smuggling activity. Accordingly, Agent Zuniga's questions cannot be found to have changed the situation into one that would require Miranda warnings. See Hickman, 523 F.2d at 327.

## IV

## WITNESSES

The Government reserves the right to change the order of, substitute, or add or omit one or more witnesses. Presently, the Government may call the following witnesses during its case-in-chief:

1. Rodrigo Angulo-Arzate
2. Carlos Del Monte-Palacios
3. Olegario Noriega-Gonzalez
4. Jason Alba, USBP
5. Jorge Zuniga, USBP
6. Canyon Sweet, USBP
7. Mark Hansen, USBP
8. Andrew Kahl, USBP
9. Angel Bermudez
10. Cynthia Rowley

//

//

//

## V

## EXHIBIT LIST

The Government will provide an exhibit list on the morning of trial. The United States intends to offer into evidence some or all of the following exhibits:

1. Photographs of Vehicle
2. Map(s) of area in question
3. Information from cellular telephones seized from Defendants
4. Evidence seized from Defendant Perez-Lemos's vehicle

The Government will make its exhibits available to the Defendant for examination in advance of trial. The Government further requests a reasonable opportunity to examine Defendant's exhibits before trial.

## VI

## PROPOSED VOIR DIRE

1. The Court will instruct you about the law. Will you follow the law as given by the Court and disregard any idea or notion you have about what the law is or should be?
2. The United States will be calling witnesses who are employed by United States Border Patrol, and possibly other branches of the Department of Homeland Security. Does anyone have family members or close friends who work, or have worked, for any of those agencies? Would that prevent you from being fair and impartial?
3. Has anyone had an unpleasant or negative experience with any law enforcement personnel? If so, please describe. Would that cause you to be biased against law enforcement?
4. Has anyone ever had any disputes with any agency of the United States Government? If so, please describe.
5. Have you or any relatives or close friends ever been accused of, or charged with, a crime involving alien smuggling?
6. Has anyone had any training in the law? If so, please explain.

7. Will you be able to put aside any feelings of sympathy or pity for the defendant, if you have any, when deciding this case?

8. Does everybody understand that the defendant is entitled to a fair trial? Does everybody understand that the United States is also entitled to a fair trial?

9. Does anyone have any moral or religious reservations that might prevent you from standing in judgment of another human being?

10. The defendant in this case is charged with aiding and abetting the transportation of human beings within the United States. Does anybody have strong feelings or opinions about United States immigration laws that would prevent you from viewing the evidence impartially?

11. Regardless of your position on the legalization or criminalization of immigration, will you be able to follow the law of the United States as it presently stands and as the judge instructs you regarding the criminal smuggling of human beings?

12. Has anyone been a member of an organization involved the "immigration debate"? Explain.

13. Does anyone believe the current immigration laws are too strict? Please explain.

14. Does anyone believe the current immigration laws are too lenient?

15. Does anyone feel strongly about the United States' immigration policies? Explain.

16. The United States will call many law enforcement personnel as witnesses. Would that prevent you from being fair and impartial?

17. Do any of you feel that it should not be a crime to enter - or assist someone else to enter - the United States illegally?

18. Do you understand that it is illegal to knowingly aid and assist someone else in the commission of a crime?

19. Do you understand that under our judicial system, anyone who knowingly aids or assists another in the commission of a crime is held equally responsible?

20. Does anyone not understand these principles or disagree with them?

//

**VII**

**JURY INSTRUCTIONS**

The Government will submit proposed jury instructions under separate cover.

Dated: July 14, 2008 Respectfully submitted,

KAREN P. HEWITT
United States Attorney

s/ Peter J. Mazza
PETER J. MAZZA
Assistant United States Attorney

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. DAVID PEREZ-LEMOS (2), Defendant. | Case No. 08CR1191-DMS<br>CERTIFICATE OF SERVICE |

IT IS HEREBY CERTIFIED THAT:

I, PETER J. MAZZA, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I have caused service of the Government's Trial Memorandum on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

1. NORMA AGUILAR, Esq.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 14, 2008.

s/ Peter J. Mazza